456 P.2d 197

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Anthony William PACE, Defendant-Appellant.**

**No. 8579.**

Supreme Court of New Mexico.

April 30, 1969.

Supplemental Opinion June 23, 1969.

Eugene E. Brockman, Norman E. Runyan, Tucumcari, for appellant.

Boston E. Witt, Atty. Gen., Roy G. Hill, Deputy Atty. Gen., James A. Maloney, Atty. Gen., Mark B. Thompson III, Asst. Atty. Gen., for appellee.

## OPINION

· MOISE, Justice.

In this appeal from a judgment and sentence of death following conviction of murder in the first degree, appellant argues six points of claimed reversible error in the trial.

Although presented by permission in a supplemental brief, we first consider point VI wherein it is argued that the procedure followed in qualifying the jury amounted to systematic exclusion of jurors who expressed scruples against the death penalty, resulting in a denial of due process under the doctrine of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The record discloses that ten prospective jurors were excused for cause. Of these, appellant asserts that seven were excused because of expressed religious, conscientious or moral scruples, and that this fact, plus a comment by the court during the voir dire that "the District Attorney is trying to qualify you for capital punishment which he has a right to do," set the tone for systematic exclusion of prospective jurors having such scruples against the death penalty.

Our examination of the record discloses that with two exceptions all those excluded, upon being questioned if they opposed capital punishment under any circumstances, stated clearly that they were so opposed to the death penalty they could not conscientiously convict, knowing that a death sentence would be imposed, or that they would never consider voting for the death penalty. In no instance did appellant object to the sustaining of the challenge. However, as to two of the prospective jurors, the situation was somewhat different. The first of these, a Mr. Sandoval, was questioned as follows:

"MR. BREEN: Do you have, in a first degree murder case, do you have any conscientious, religious or moral scruples against the imposition of capital punishment as a penalty—

"MR. SANDOVAL: Yes, sir.

"MR. BREEN: You do have?

"MR. SANDOVAL: (Nodding head.)

"MR. BREEN: In other words, it wouldn't make any difference how heinous the facts were, would you refuse to vote for first degree murder without a recommendation, knowing it carried the death penalty?

"MR. SANDOVAL: What was that again?

"MR. BREEN: Would you, Mr. Sandoval, would you refuse to vote for first degree without recommendation, knowing it carried capital punishment, death penalty?

"MR. SANDOVAL: Well, yes, sir, I wouldn't.

"THE COURT: How's that? Let me explain, Mr. Sandoval. We have the law and when you take an oath to uphold the law you want to uphold it, don't you?

"MR. SANDOVAL: Yes, sir.

"THE COURT: But if you have any religious or moral or conscientious scruples against the imposition of the death penalty in any case, that's what you are being asked, do you have it? In any occasion, regardless of how terrible the crime may have been, would you or would you not vote for first degree?

"MR. SANDOVAL: Well, it all depends, I would say.

"THE COURT: Certainly, I think it all depends, ordinarily, but then some people will just never vote for capital punishment and some are willing to go along with the facts and the law.

"MR. BREEN: Are you against capital punishment?

"MR. SANDOVAL: Yes, sir.

"MR. BREEN: Conscientiously, religiously, or is that right, Mr. Sandoval?

"MR. SANDOVAL: That's right.

"MR. BREEN: I challenge for cause, your Honor.

"THE COURT: Any objection?

"MR. BROCKMAN: I believe, your Honor, the witness or the juror stated that it all depends on the circumstances.

"THE COURT: You want to question him any?

"MR. BROCKMAN: No, your Honor.

"THE COURT: You are excused, Mr. Sandoval. Please take your place in the audience. The Clerk will call one name, please."

The second was a Mr. Vigil, whose brief examination proceeded as follows:

"THE COURT: Do you have any moral, conscientious or religious scruples against the infliction of the death penalty as a punishment for murder in the first degree?

"MR. VIGIL: I do.

"THE COURT: Do you favor the infliction of the death penalty as a punishment for murder?

"MR. VIGIL: No, sir.

"THE COURT: You do not, anything [any time]?

"MR. BREEN: Challenge.

"THE COURT: Resist, you resist or not? He is against capital punishment.

"MR. BROCKMAN: No.

"THE COURT: You will be excused, Mr. Vigil. Take your place. One name, please."

We see in the excusing of these latter two prospective jurors, a possible failure to interrogate them to determine definitely that they would not convict knowing the death penalty would be imposed. However, counsel for appellant had the responsibility to do this if he could and desired to try, and the court in no way prevented his doing so but, to the contrary, invited such an effort.

■ Although we have no decisions on the specific subject, we have held that where a prospective juror states that he has an opinion as to the guilt or innocence of a defendant based upon something he had heard or read, he can nevertheless qualify as a juror if he asserts that he could and would lay aside any such views, and reach a decision solely on the law and evidence as presented in the trial. State v. Burkett, 30 N.M. 382, 234 P. 681 (1925); State v. Anderson, 24 N.M. 360, 174 P. 215 (1918); State v. Rodriguez, 23 N.M. 156, 167 P. 426 (1917), L.R.A. 1918A, 1016. In State v. McFall, 67 N.M. 260, 263, 354 P.2d 547 (1960), we detailed the requirements of an impartial jury in the following language:

"Article II, § 12, of the New Mexico Constitution, guarantees a trial by jury and Article II, § 14, provides, among other things, that the trial shall be by an 'impartial' jury. By impartial jury is meant a jury where each and every one of the twelve members constituting the jury is totally free from any partiality whatsoever. Coughlin v. People, 144 Ill. 140, 33 N.E. 1, 19 L.R.A. 57; Stevens v. State, 94 Okl.Cr. 216, 232 P.2d 949. 'Impartial' is defined in Webster's New International Dictionary (2nd Ed.), as 'not partial; not favoring one more than another; treating all alike; unbiased; equitable; fair; just.' Accordingly, the jury which one charged with crime is guaranteed, is one that does not favor one side more than another, treats all alike, is unbiased, equitable, fair and just. If any juror does not have these qualities, the jury upon which he serves is thereby deprived of its quality of impartiality. * * *"

It is clear from the foregoing, and to our knowledge it has been the uniform practice followed in qualifying jurors for service in a particular case, that an effort be made to establish if the venireman could enter the jury box with an open mind, freed of all preconceived bias or prejudice, regardless of its source, and thus render a fair and impartial verdict between the state and the defendant. This principle is as applicable to expressed conscientious scruples against the death penalty as it is to announced opinions based on out of court hearsay. As a matter of fact, in the instant case, as to one prospective juror (Mr. Petrolino Vigil), although he stated he was

opposed to capital punishment, he further answered, "If the evidence is there, well, I guess I would vote for it (capital punishment), * * * " and then stated that if faced with it, he would " * * * live up to it and do it if the facts and law required it." There was no challenge for cause after this inquiry.

We have no statute such as was present in Illinois and held to result in a deprivation of constitutional rights when interpreted and applied as was done in Witherspoon v. Illinois, supra. Our practice has always approximated the requirements as laid down in that case, and there was no departure evident here. By virtue of this fact we do not consider applicable In re Anderson, Cal., 447 P.2d 117 (1968), wherein the rule of Witherspoon was applied to reverse a conviction in a case tried before it had been announced and where a different rule of disqualification was applied. Our procedure more nearly compares with that followed in New Jersey and held in State v. Mathis, 52 N.J. 238, 245 A.2d 20 (1968), not to conflict with the decision in Witherspoon, supra. Also see Veney v. State, Md. App., 246 A.2d 568 (1968).

The facts here are in no sense comparable to those considered in Witherspoon v. Illinois, supra, where it was clear that the court understood the statute to require that all veniremen having conscientious scruples must be excused. This was done without questioning them at any length as to whether apart from their feelings against the death penalty, they would convict in a proper case if convinced of the defendant's guilt under the law as given by the court. Of 47 veniremen excused upon challenge for cause, only 5 "stated that under no circumstances would they vote to impose capital punishment." The situation was not remotely comparable to that here present, where the worst than can be said is that two prospective jurors were excused without any real effort by appellant to qualify them after they expressed doubts or a question concerning their feelings on the subject. It is implicit in the court's inquiry of appellant's counsel as to whether they wanted to examine the prospective jurors, or opposed the challenges, that if it could have been demonstrated that regardless of the feelings of the venireman, he would convict in a proper case, the challenges would have been overruled. Nothing more is required. We quote from Witherspoon v. Illinois, supra:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them. For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it.

" * * *

"If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die."

We do not find in the procedure followed in the present case anything contrary to what was there held. We have also noted the decision in Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 138, 22 L.Ed. 2d 433 decided in the United States Supreme Court on April 2, 1969, but find nothing contained therein different from

the holding in Witherspoon, supra, or that requires a different result from the one reached by us. The point is ruled against appellant.

In his first point of his brief in chief, appellant contends that the court erred in admitting certain statements of his which resulted from interrogations by the police, assertedly violative of his rights under the doctrine of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It appears that the police stopped the defendant at a roadblock and, by reading from a card, immediately advised him of his rights to remain silent, that statements made by him might be used against him, and that he had a right to have an attorney, either retained or appointed, present with him. It is defendant's position that the requirements of Miranda, supra, are not met by the mere reading of a statement of defendant's rights from a card and then, without more, launching into an interrogation.

The record discloses that after reading the statement of rights, the police officer inquired if defendant understood, and his reply was in the affirmative. He was then asked his name and who owned the car, a wallet found in it, and a small calibre pistol. He answered that they all belonged to his "boss," one Bill Murdock whom he said he had left in a motel in Logan. Further, there is testimony that defendant "seemed hesitant" to talk. However, the officer testified that this was after the responses already noted had been made and, upon his hesitating, the questioning ceased. We see nothing in the procedure followed or in the interrogation which raises any question concerning denial of rights under the rule of the Miranda case, supra. We quote therefrom:

"* * * As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

■ We do not perceive that when defendant answered the questions noted above after having his rights explained to him, and having indicated he understood them, there can be any suggestion that he did not do so voluntarily and with full knowledge that he could remain silent and demand the presence of an attorney before answering questions. In our view, there can be no doubt that the rights explained in Miranda, supra, were afforded. Compare State v. Hall, 78 N.M. 564, 434 P.2d 386 (1967).

■ Appellant next complains that reversible error resulted from the fact that on rebuttal the trial court permitted three witnesses to testify concerning the good reputation of decedent in the community. The rule in this regard is clear to the effect that although not admissible in the first instance, when defendant in his defense undertook to question decedent's character in any respect, the State on rebuttal could then offer proof of reputation that would cast doubt that decedent would have acted in the manner claimed. In State v. Johnson, 24 N.M. 11, 172 P. 189 (1918), where there was proof that deceased had used insulting language toward defendant's wife which it was claimed resulted in the assault from which

decedent died, and had in another instance used abusive language, it was held that the State properly could prove the decedent was not the type of man to make such remarks, by showing his general reputation for morality and decency. We stated, "* * * the rule is well settled that, where the reputation of the deceased in a case of this character has once been put in issue by the defendant, the state may offer testimony in rebuttal upon that subject, * * *."

The rule has been applied where a defendant claims self-defense and asserts decedent acted violently toward him, thus opening the door to proof of reputation of the deceased, as to peace and quietude. State v. Brock, 56 N.M. 338, 244 P.2d 131, 34 A.L.R.2d 447 (1952); State v. Todd, 28 N.M. 518, 214 P. 899 (1923).

In the instant case defendant testified that immediately before the shooting, the decedent had made certain moves and suggestions of possible homosexual activity. Three witnesses testified on rebuttal, over defendant's objection, that decedent's reputation for morality in the community in which he lived was good. The next morning, following introduction of the reputation evidence and upon a mistrial being moved, the court ruled that the jury should be instructed that the evidence was withdrawn and was not to be considered by it, but a mistrial was denied. Thereafter, the jury was advised and instructed to disregard the evidence of good character which had been received previously. Appellant argued that the error could not be cured in this manner, but was overruled.

While we fully recognize that it is not every error that can be rectified through an instruction to the jury to disregard evidence that has been introduced, see State v. Rowell, 77 N.M. 124, 419 P.2d 966 (1966), we are not convinced that the mistake here asserted, under the circumstances of this case, is of that character. Rather, it is our view that any error concerning the evidence here introduced was cured, and any possible prejudice eliminat-

ed, when the judge withdrew the evidence and the jury was so advised. See State v. Ferguson, 77 N.M. 441, 423 P.2d 872 (1967); State v. Stewart, 34 N.M. 65, 277 P. 22 (1929).

We would add a word that under the rule in the Brock and Johnson cases, supra, we do not consider that it was error to receive the character evidence. See 1 Wigmore, Evidence, § 63 (3rd Ed. 1940); McCormick, Evidence, § 160 (1954). It was clearly the position of defendant that he shot decedent accidentally when he produced a gun to frighten decedent after he had made improper sexual advances. As a matter of fact, appellant requested, and the court instructed the jury that sodomy is a crime under the laws of New Mexico, and that the State had the burden to establish beyond a reasonable doubt that appellant had not killed decedent in the necessary defense of himself against such an unlawful attack by decedent.

Appellant next complains concerning an instruction given to the effect that the jury could find the defendant guilty of first degree murder if it was convinced beyond a reasonable doubt that he had taken "an automobile *intentionally* and without the owner's consent" and that in so doing defendant had killed decedent. It is his position that the instruction is defective because it does not state that the intent to steal the automobile must have been formed before the act leading to decedent's death occurred.

■ We do not consider the instruction defective, as asserted by appellant. As we read it, there can be no doubt that it tells the jury that if, while taking the automobile with intent to deprive the owner thereof, the owner was killed, this is a homicide effected while perpetrating a felony, and is murder in the first degree. The necessity for the intent to be present to constitute a felony is unequivocally stated. Further, an additional instruction was given in which "intent" was defined and explained. We see no error in the instruction.

▇ A point is made that the actions of the court in stopping defense counsel during his summation and instructing him "to speak from the evidence in this case" constitutes reversible error. The record discloses that the judge interrupted counsel when he was making a comparison between the defendant's conduct in this case and the conduct of a person in a different hypothetical situation. Our examination of the incident discloses what to our minds was unobjectionable argument. We have held that in civil cases counsel are entitled to a reasonable measure of latitude in closing remarks to a jury. Beal v. Southern Union Gas Co., 66 N.M. 424, 349 P.2d 337, 84 A.L.R.2d 1269 (1960). We can perceive of no reason for a different rule in criminal cases. See Sanders v. United States, 238 F.2d 145 (10th Cir. 1956). On the other hand, there is another equally important rule that is applicable here. It is to the effect that a trial court has wide discretion in dealing with and controlling counsel's argument to the jury and, if no abuse of this discretion or prejudice to defendant is evident, error does not result. Hunter v. Kenney, 77 N.M. 336, 422 P.2d 623 (1967); Beal v. Southern Union Gas Co., supra; Territory v. Cordova, 11 N.M. 367, 68 P. 919 (1902). In the instant case, the court did nothing beyond admonishing counsel to stay within the record. In order that no prejudice to defendant result, the court of its own motion also advised the jury the statement to defense counsel was not meant to "chastise him or to be any prejudice to his client or himself," but was to keep him within the case. At the same time, the judge called attention to an improper statement of the assistant district attorney, and the jury was told not to hold such statements against the parties but to "go by the facts in the case." Although, as indicated, the court possibly held counsel closer to the proof than is ordinarily required, we certainly can see no abuse of discretion, or possibility of prejudice to the defendant. It did not constitute reversible error.

▇ As a final point appellant argues that our law whereby a death penalty shall be imposed under certain circumstances upon conviction of a capital felony (§ 40A–29–2, N.M.S.A.1953) is contrary to Amendment VIII of the Constitution of the United States which prohibits the inflicting of cruel and unusual punishments. A thoughtful and eloquent argument has been made in support of this position, not to the effect that the method for putting to death is cruel or unusual but, rather, that the death penalty by whatever means death is brought about, should be declared to be contrary to the constitutional provision. Our attention has not been directed to any cases so holding. To the contrary, as was stated in Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422, 426 (1947):

"* * * The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. * * *"

▇ We would note that the question here presented was before this court and held not to violate Amendment VIII as early as 1901, in Territory v. Ketchum, 10 N.M. 718, 65 P. 169, 55 L.R.A. (1901). Since that time nothing has transpired which requires that we depart from that holding. If the law is to be changed, it is for the legislature to do it—not us. See In re Anderson, supra. We are not heedless of the plea that this is a more enlightened day than were those of years gone by, and that views of what is and what is not right have changed with the passage of time. However, we perceive our responsibility as being confined to interpreting the law as we understand it, not to making of new law to satisfy our conceptions of right or wrong. The legislature, we feel confident, is no less interested than we in keeping our laws in step with current thinking, and it is not for us to act where they have not considered a change necessary or desirable. For a few cases

that have considered the problem recently and, without exception, have arrived at the same conclusion as we, see Bell v. Patterson, 279 F.Supp. 760 (D.C.Colo.1968); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968); People v. Thomas, 65 Cal.2d 698, 56 Cal.Rptr. 305, 423 P.2d 233, 240 (1967); Manor v. State, 223 Ga. 594, 157 S.E.2d 431 (1967); State v. Kilpatrick, 201 Kan. 6, 439 P.2d 99 (1968); State v. McClellan, 12 Ohio App.2d 204, 232 N.E.2d 414 (1967); State v. Gamble, 249 S.C. 605, 155 S.E.2d 916 (1967). We would note that since this appeal was submitted, ch. 128, N.M.S.L.1969, eliminating the death penalty except in certain limited situations, has been passed by the legislature and signed by the Governor. However, this act is not yet effective, and, accordingly, in what we have said above, we give no consideration to any possible effect thereof in this case.

Having considered each of the points advanced for reversal of the conviction, and having found none of them to be meritorious, the judgment and sentence are affirmed. It is so ordered.

NOBLE, C. J., and COMPTON, CARMODY and TACKETT, JJ., concur.

### SUPPLEMENTAL OPINION

PER CURIAM.

Pursuant to an order entered in this cause on the 30th day of April, 1969, the issuance of mandate herein was delayed to permit counsel to file briefs on the issue of the applicability of ch. 128, N.M.S.L. 1969, effective June 20, 1969. Briefs have now been filed and considered, and the question reserved should now be decided.

By ch. 128, N.M.S.L.1969, the legislature abolished the death penalty for crime except in particular circumstances not here applicable. The offense for which the defendant was convicted having been committed before the death penalty was so abolished, is defendant to be punished under the law applicable when the act was committed, or the law as it has been changed?

■■ We conclude that defendant is entitled to the benefits of the new law. We arrive at this conclusion through recognition of the fact that while the case was pending on appeal the judgment and sentence of death imposed at the trial had not become final. See State v. Pardon, 272 N.C. 72, 157 S.E.2d 698 (1967). It is clear from ch. 128, Sec. 3, N.M.S.L.1969, that the legislature intended the act to apply retroactively. We perceive no reason under the constitution why it could not make the law applicable in situations where, as here, the case was pending on appeal. Compare In re Estrada, 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 (1966). We see nothing to the contrary in State v. Armstrong, 61 N.M. 258, 298 P.2d 941 (1956), or in State v. Sublett, 78 N.M. 655, 436 P.2d 515 (Ct.App.1968).

This is true even though some question may be present as to whether Section 3 which provides for revocation of death penalties already imposed and substitution of a sentence of life imprisonment contravenes Art. III, § 1, or Art. V, § 6, N.M. Const., where the sentence is final. We find it unnecessary to consider that problem. Neither does the change of penalty violate Art. IV, § 34, N.M.Const., which prohibits alteration of rights, remedies or rules of evidence or procedure in a pending case. Compare Woo Dak San v. State, 36 N.M. 53, 7 P.2d 940 (1932).

It is our considered judgment that although we have concluded the defendant's conviction and sentence were correct, nevertheless, since the execution could not be carried out before the effective date of ch. 128, N.M.S.L.1969, the cause should be remanded to the district court so that defendant can be resentenced thereunder.

It is so ordered.